UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUSTY STAHL,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ROBERT C. KLOTZ, et al.,<br><br>　　　　　Defendants. | No. 2:19-cv-00496-DAD-CKD<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br><br>(Doc. No. 43) |

　　　　This matter is before the court on the motion for summary judgment, or in the alternative, partial summary judgment, filed by defendants Robert C. Klotz and Dawn Harmon ("defendants") on March 28, 2022. ECF No. 43. The court heard oral argument and took the motion under submission on May 6, 2022. ECF No. 47.[1] Attorney James McGlamery appeared on behalf of plaintiff Stahl, and attorney Graham Mills appeared on behalf of defendants.

　　　　Plaintiff Dusty Stahl ("Stahl") worked as a court clerk in the Amador County Superior Court until she was terminated in 2018. In this civil rights action brought against defendants (two of the superior court's administrators at the time of Stahl's termination), Stahl claims that the termination deprived her of rights without a hearing and effectively blacklisted her from her

---

[1] On August 25, 2022, this case was reassigned to the undersigned. ECF 48.

1

1  chosen profession, all in violation of the Due Process Clause.  For the reasons explained below,
2  defendants' motion for summary judgment will be granted in part and denied in part.  In short, the
3  court concludes that defendants have not shown that they are entitled to judgment as a matter of
4  law on Stahl's claim that she was terminated without adequate process, but Stahl also has failed to
5  come forward with evidence on summary judgment that could prove the defendants have
6  excluded her from her chosen profession.

## BACKGROUND

In the words of its current executive officer, the Amador County Superior Court is "very small."  Harmon Dep. at 10, ECF No. 45-4.  It has two judges, one commissioner, and fewer than thirty people on its support staff.  Stahl Dep. at 16–17, Pl.'s Ex. C, ECF No. 45-2; Harmon Dep. at 8–9, Pl.'s Ex. G, ECF No. 45-4; Klotz Decl. ¶ 1, ECF No. 43-6; Klotz Dep. at 9–10, ECF No. 45-4.

Stahl started as a courtroom clerk in the Amador County Superior Court in 2010.  Stahl Decl. ¶ 3, ECF No. 45-2.  She made a few mistakes along the way—for example, she once prepared an inaccurate judgment, and once did not recall a warrant—but her annual reviews described her work positively.  *Id.* ¶¶ 3–4.  Attorneys, people with business before the court, and other members of the court's staff praised her professionalism, friendly attitude, and work ethic. *See, e.g.*, Def.'s Ex. 32 at 37–49, ECF No. 43-11; Klotz Dep. at 34–37, ECF No. 45-3; Harmon Dep. at 11, ECF No. 45-4.  Within a few years, Stahl was promoted and became the lead criminal courtroom clerk.  Stahl Decl. ¶ 3.

One of Stahl's duties was completing post-hearing minute orders in criminal cases. *See* Stahl Decl. ¶ 6.  Stahl had been trained to record accurately what happened in each criminal hearing in these minute orders.  *Id.*  She remembers a 2012 memo in particular.  *Id.*  It cited a case involving a court clerk who had, in the Court of Appeal's words, "included in the minutes and the abstract of judgment some provisions that were not in the judge's pronouncement of sentence," *People v. Zackery*, 147 Cal. App. 4th 380, 385 (2007).  This impressed on Stahl the importance of accurate records and minute orders.  *See* Stahl Decl. ¶ 6.

/////

In 2016, Stahl began working with a newly appointed judge. *Id.* ¶ 7. She soon developed concerns about the judge's criminal hearings and minute orders. For example, she saw that other courtroom clerks had recorded minute orders claiming the judge had advised criminal defendants of certain rights when she had not actually done so. *Id.* Stahl also noticed other possible problems, such as sentences imposed over the phone to defendants without attorneys and sentences imposed in the defendant's absence without a plea. *Id.* Stahl raised her concerns with her direct supervisor, who went to the court's executive officer. *Id.* ¶ 8. Stahl also spoke directly with the presiding judge. *Id.* ¶ 8. The presiding judge seemed unconcerned. *See id.* He suggested Stahl give his colleague more time to "get into the swing of things." *Id.*

Problems persisted. *Id.* ¶ 9. Stahl's once-friendly relationship with the other members of the new judge's staff also became icy. *See id.* ¶ 12. She met with her supervisor, another clerk, and the court's human resources administrator, to talk about what she describes as "hostility" from the new judge's staff. *Id.* Conditions did not improve. *Id.* The new judge also became angry with Stahl and "scolded" her. *Id.* ¶¶ 9–10. Stahl did not know it at the time, but the new judge also raised concerns about Stahl's professionalism with the court's executive officer, its human resources administrator, and the presiding judge. *Id.*

Stahl then took an approved medical leave. *Id.* ¶ 12. While she was out, she learned the court had engaged an outside attorney to investigate her. *Id.* Stahl believed the investigation was instigated in retaliation for her raising of concerns about the new judge's procedures. *Id.* She went again to the presiding judge. *Id.* He told her "there was nothing he could do" and urged her to use "proper channels." *Id.* Stahl was then unexpectedly barred from the judicial side of the superior court building. *Id.* ¶ 11. Her supervisor and the court's human resources administrator did not know why. *Id.*

A few months later, just days before Stahl's medical leave was set to end, the court placed her on paid administrative leave while it reviewed the results of the outside attorney's investigation. *Id.* ¶ 13. The next month, Stahl's union representative told her the court was planning to put her on unpaid leave. *Id.* ¶ 14. But the same day, he called again and said she would be fired that very afternoon. *Id.*

Stahl was in fact terminated that day during a meeting with her union representative, her supervisor, the human resources administrator, and the court's executive officer. *Id.* To Stahl, the human resources administrator appeared to be in charge. *Id.* They gave her a three-page letter. *See id.*; Termination Letter (Apr. 13, 2018), Def. Ex. 20, ECF No. 43-9. According to the letter, the court was firing Stahl for "misconduct," citing results of the outside attorney's investigation:

> 1. The investigation found by a preponderance of the evidence that Ms. Stahl behaved in an unprofessional manner towards Ms. Giron and Ms. Gardella [two other members of the new judge's staff]. Although Ms. Stahl denied that she was unprofessional and claimed that she was on the receiving end of unprofessional conduct from Ms. Giron and Ms. Gardella, substantial evidence weighed against Ms. Stahl's denial.
>
> 2. The investigation found by a preponderance of the evidence that Ms. Stahl interacted with Court staff and justice partners in an unprofessional manner in the courtroom.
>
> 3. The investigation found by a preponderance of the evidence that Ms. Stahl made alterations on Court minutes because she disagreed with Judge Renee Day [the new judge].
>
> 4. The investigation found by a preponderance of the evidence that Ms. Elmore [Stahl's supervisor] was aware of employee concerns regarding Ms. Stahl and she took steps to address them.

Termination Letter at 2. The letter also cited the court's rules forbidding the "[f]alsification of any Court document" and "[a]ltering, tempering, removing, or destroying records without permission." *Id.* at 3.

This was the first time Stahl had heard accusations of her having engaged in misconduct. Stahl Decl. ¶ 14. She denies behaving unprofessionally. *Id.* She also denies that she altered court orders. *Id.* Minute orders are normally issued on forms, and court clerks check boxes on the forms to show when the court had completed a certain procedure or given a particular warning. *See* Stahl Dep. at 84, ECF No. 43-9. Stahl explains she simply crossed out whatever portions of the form order listed admonitions or warnings the judge had not given, so as to avoid giving the impression that something had happened when it had not. *See id.*

/////

Stahl asked if she was entitled to a hearing. *Id.* According to Stahl, the court's personnel manual promised her a hearing, and at that hearing, she could have called witnesses and presented evidence. *See* Personnel Manual § 11.1.6, Def. Ex. 9, ECF No. 43-8. The human resources administrator did not answer Stahl's question about a hearing directly, but it was clear her answer was no—at least not before she was terminated; she told Stahl to contact a lawyer. Stahl Decl. ¶ 14.

Stahl tried to find a new job. She inquired at local law firms, the district attorney's office, county administrative offices, and the superior court in the neighboring county. *Id.* ¶ 16. These efforts were mostly fruitless. Potential employers always asked why she had left the superior court, and she always answered, always denying any misconduct or unprofessionalism. *See id.* ¶¶ 16–17. She believes potential employers contacted the superior court and learned that she had been accused of misconduct, harassment, and altering minute orders, but she cannot say for sure, and discovery conducted in this case has not offered any clarity. *See id.* ¶ 17. The court's human resources administrator and executive officer deny disclosing any information about Stahl's termination to her prospective employers or to anyone else. Klotz Decl. ¶ 5; Harmon Decl. ¶ 7. Stahl did eventually find part-time work with a solo probate practitioner. *Id.* ¶ 16. She made only about a quarter of the salary she had earned before, and the job soon ended when business slowed during the COVID-19 pandemic. *Id.*

The termination of her employment has affected Stahl on a more personal level as well. Amador County is a small community. *Id.* ¶ 17. Stahl's former colleagues, once friendly to her, now ignore her at social gatherings and when they see her running errands. *Id.* ¶ 18.

Under an agreement between the superior court and Stahl's union, Stahl could have challenged her termination in arbitration. *See* Mem. of Understanding § 18.1.6, Dec. Ex. 10, ECF No. 43-8. Stahl wanted to pursue such a challenge, but because the court had refused to turn over its investigative file, her union representative could not confirm the union would represent her. *See* Stahl Decl. ¶ 20. Stahl was also worried the arbitration would be biased and futile. *See id.* If she lost, her only recourse would be to file a mandamus petition, which she believes the Amador

/////

1  County Superior Court would itself adjudicate.  *See* Personnel Manual § 11.1.8; Cal. Civ. Proc.
2  Code § 1094.5.

3  Stahl decided to pursue civil rights and whistleblower claims in this court.  Her original
4  complaint included constitutional claims under 42 U.S.C. § 1983 and an ancillary claim under
5  California-law whistleblower protections.  *See generally* Compl., ECF No. 1.  The court
6  dismissed her whistleblower claim because state law does not protect those who disclose public
7  information, such as the proceedings in a criminal case, and Stahl had not explained what
8  nonpublic information she had revealed.  *See generally* Order (Aug. 2, 2019), ECF No. 14; Order
9  (Feb. 29, 2020), ECF No. 25.  Two of plaintiff's claims against two defendants remain in this
10 action.  In her first claim, Stahl alleges the court's executive officer (defendant Robert Klotz) and
11 human resources administrator (defendant Dawn Harmon) deprived her of liberty and property
12 interests by firing her arbitrarily and preventing her from pursuing her profession.  *See* Second
13 Am. Compl. ¶ 29, ECF No. 27.  In her second claim, Stahl alleges both defendants deprived her
14 of due process, among other things by firing her without notice or a chance to confront the
15 evidence against her.  *Id.* ¶ 34.

16 On March 28, 2022, defendants filed the pending motion for summary judgment, or in the
17 alternative, partial summary judgment.  Motion, ECF No. 43.  On April 21, 2022, plaintiff filed
18 an opposition to the pending motion, and on April 29, 2022, defendants filed their reply thereto.
19 Opp'n, ECF No. 45; Reply, ECF No. 46.

20                              **LEGAL STANDARD**

21 Summary judgment is appropriate if "there is no genuine dispute as to any material fact
22 and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is
23 "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*
24 *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome
25 of the suit under the governing law."  *Id.*

26 The party moving for summary judgment must first show no material fact is in dispute.
27 *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  It can do so by showing the record
28 establishes facts beyond genuine dispute, or it can show the adverse party "cannot produce

1 admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving must then
2 "establish that there is a genuine issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith*
3 *Radio Corp.*, 475 U.S. 574, 585 (1986). Both must cite "particular parts of materials in the
4 record." Fed. R. Civ. P. 56(c)(1). The court views the record in the light most favorable to the
5 non-moving party and draws reasonable inferences in that party's favor. *Matsushita*, 475 U.S. at
6 587–88; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## ANALYSIS

Stahl's claims rest on the Due Process Clause of the Fourteenth Amendment. There are two "analytically distinct" aspects of that clause. *Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 66 (9th Cir. 1994). The first aspect, its "substantive" component, prohibits the government from taking certain actions no matter how fairly and deliberately it proceeds, *Daniels v. Williams*, 474 U.S. 327, 331 (1986), and "no matter how many procedural safeguards it employs," *Blaylock v. Schwinden*, 862 F.2d 1352, 1354 (9th Cir. 1988). This prohibition protects "fundamental" rights that are "central to individual dignity and autonomy." *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015). The second, "procedural" aspect of the Due Process Clause requires the government to undertake an adequate process if it deprives a person of a constitutionally protected right. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). These requirements are independent. "A procedurally flawed policy can pass substantive muster, and, conversely, a procedurally flawless policy can be substantively unacceptable." *Wedges/Ledges*, 24 F.3d at 66. Stahl asserts both types of due process claims in this action.

**A.   Substantive Rights**

Stahl must show at the threshold that she has "a liberty or property interest protected by the Constitution." *Id.* at 62. The defendants argue Stahl did not have a constitutionally protected right to her specific position. *See* Mem. at 9–10. The Supreme Court and Ninth Circuit have not explicitly decided whether tenured public employees can assert a substantive right to a specific position. Most other circuit courts have held they cannot. *See, e.g.*, *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000) (collecting authority). Some federal district courts within the Ninth Circuit have concluded that the circuit has implicitly endorsed that majority position. *See,*

7

*e.g.*, *Lane v. Marion Cnty.*, No. 19-cv-287, 2020 WL 5579820, at *3 (D. Or. Sept. 17, 2020) (citing *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir. 2007), *aff'd on unrelated question*, 553 U.S. 591 (2008)). Others have concluded that the question is unanswered or that the circuit has adopted an alternative legal test. *See, e.g.*, *Reinlasoder v. City of Colstrip*, No. 12-cv-107, 2013 WL 6048913, at *9 (D. Mont. Nov. 14, 2013), *report and recommendation adopted*, 2014 WL 229794 (D. Mont. Jan. 21, 2014); *Rivers v. Cnty. of Marin*, No. 09-cv-1614, 2010 WL 145094, at *6 (N.D. Cal. Jan. 8, 2010).

It is not necessary in this case to decide whether Ninth Circuit precedent explicitly permits substantive due process claims about a specific position. If the question is open, as it appears to be, the court finds the majority position outside the Ninth Circuit to be persuasive. "[T]enured public employment is a wholly state-created contract right; it bears little resemblance to other rights and property interests that have been deemed fundamental under the Constitution." *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 143 (3d Cir. 2000); *accord, e.g.*, *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1994) ("We do not think, however, that simple, state-law contractual rights, without more, are worthy of substantive due process protection."). "The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 359–60 (1976). Stahl cites no similar case in which a plaintiff has successfully asserted a substantive constitutional right to a specific position, and the court has located none. To the extent Stahl asserts a substantive claim based on a right to hold her particular position, defendants' motion for summary judgment as to such a claim will be granted.

For more than a century, however, the Supreme Court has held "that the right to work for a living in the common occupations of the community" is the "very essence" of the freedoms the Fourteenth Amendment secures. *Truax v. Raich*, 239 U.S. 33, 41 (1915). Federal courts recognize "the pursuit of an occupation or profession" as a "protected liberty interest that extends across a broad range of lawful occupations." *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999). Although the "precise contours of that liberty interest remain largely undefined," *id.*,

/////

1    the Supreme Court's decisions suggest it is concerned "with a complete prohibition of the right to
2    engage in a calling," not a "brief interruption," *Conn v. Gabbert*, 526 U.S. 286, 292 (1999).

3    When the Ninth Circuit has considered government actions that cut people off from their
4    chosen professions, it has imposed a two-part test. Plaintiffs must show, first, that they can no
5    longer pursue their chosen occupation and, second, that "this inability is due to actions that
6    substantively were 'clearly arbitrary and unreasonable, having no substantial relation to the public
7    health, safety, morals, or general welfare.'" *Wedges/Ledges*, 24 F.3d at 65 (quoting *FDIC v.*
8    *Henderson*, 940 F.2d 465, 474 (9th Cir. 1991)). Substantive due process claims against a former
9    employer can succeed "against government employer actions that foreclose access to a particular
10   profession to the same degree as government regulation." *Engquist*, 478 F.3d at 997–98. But
11   such a claim can succeed only in "extreme cases, such as a 'government blacklist, which when
12   circulated or otherwise publicized to prospective employers effectively excludes the blacklisted
13   individual from his occupation, much as if the government had yanked the license of an
14   individual in an occupation that requires licensure.'" *Id.* at 997–98 (quoting *Olivieri v.*
15   *Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997)). "It is not enough that the employer's stigmatizing
16   conduct has some adverse effect on the employee's job prospects; instead, the employee must
17   show that the stigmatizing actions make it virtually impossible for the employee to find new
18   employment in his chosen field." *Id.* at 998 (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*,
19   233 F.3d 524, 531 (7th Cir. 2000)).

20   Here, Stahl could likely prove at trial that she has not been able to find work as a court
21   clerk or legal assistant. The only legal position she secured after her termination was part-time,
22   short-lived, and compensated meagerly. Stahl Decl. ¶¶ 16–18. She could not prove she was
23   deprived of due process, however, just by showing she cannot find comparable legal work. She
24   must also prove the defendants' "stigmatizing actions" are what made it "virtually impossible" for
25   her to "find new employment in [her] chosen field." *Engquist*, 478 F.3d at 998. Both defendants
26   have filed declarations under penalty of perjury averring (1) they have not disclosed and will not
27   disclose her termination letter to any prospective employer or the public at large, (2) they have
28   not discussed the reasons for Stahl's termination with anyone after her termination, and (3) they

9

have not discussed Stahl's performance with any prospective employers. Harmon Decl. ¶ 7; Klotz Decl. ¶ 5. In response, Stahl hypothesizes in a declaration that Harmon and Klotz spoke to court staff, who in turn "spread rumors about [her] termination." Stahl Decl. ¶ 18. At the summary judgment stage of litigation, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Evid. 56(c)(4). Stahl's hypotheses and inferences, although perhaps reasonable, are not drawn from her personal knowledge. She has not explained how she could testify competently about conversations she did not witness. As a result, there is no genuine dispute to resolve at trial in this regard.

In addition to her claim that the defendants deprived her of a right to pursue her profession generally, Stahl alleges that her termination deprived her of a protected liberty interest by publicly branding her with a reputation for misconduct and unprofessionalism. *See* Second Am. Compl. ¶ 34; Opp'n at 16–19. The Ninth Circuit has recognized such a claim as distinct from a claim that the government effectively excluded a former employee from a chosen profession. *See Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998) (considering both types of claims).

"[T]o infringe on a constitutionally protected liberty interest, the charges must be published." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 907 (9th Cir. 1993) (citing *Bishop v. Wood*, 426 U.S. 341 (1976)). Stahl cannot satisfy the "publication" requirement by proving she disclosed the reasons for her termination herself. *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1131 (9th Cir. 2001) ("[D]ue process rights are not implicated by [an employee's] own disclosures."). Moreover, as explained above, Stahl has not come forward with any evidence on summary judgment that could prove defendants Harmon and Klotz "published" any stigmatizing accusations. It may be that her termination letter is still in her personnel file, but even if she could prove that it is, she has not cited to any evidence before the court that could show a potential employer could discover and read it. *Cf. Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004) (concluding that a stigmatizing letter in a personnel file was "published" because once

/////

it was "placed into [the employee's] personnel file, it became a public record under Washington law, mandating disclosure upon request").

Accordingly, defendants' motion for summary judgment as to Stahl's substantive due process claim will be granted.

**B.     Procedural Rights**

In her second claim, Stahl alleges the defendants deprived her of due process by terminating her employment without a hearing. *See* Second Am. Compl. ¶ 34. The Due Process Clause prohibits the government from depriving a person of life, liberty, and property rights without adequate process. *Loudermill*, 470 U.S. at 541. To prevail on a claim of inadequate process under § 1983, a plaintiff must show: (1) they had a liberty or property interest protected by the Constitution, (2) the government deprived them of that interest, and (3) the government's process was inadequate. *Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 983 (9th Cir. 2011).

Defendants do not contest Stahl's claim that she could be terminated only "for cause" under California law. *See* Opp'n at 14; Reply at 2–3, 8–9; Second Am. Compl. ¶ 34. If plaintiff established that fact at trial, she could likely prove she had a constitutionally protected property interest that could support her procedural due process claim. *See, e.g.*, *Gilbert v. Homar*, 520 U.S. 924, 928–29 (1997) ("[P]ublic employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process."). It is also undisputed that Stahl's employment was terminated. What remains, then, is the process itself and whether defendants deprived Stahl of her protected right without providing the process she was due.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Gilbert*, 520 U.S. at 930 (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "To determine what process is constitutionally due," the court balances three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the

11

Government's interest." *Id.* at 931–32 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). In the public employment realm, these factors boil down to "the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." *Loudermill*, 470 U.S. at 542–43. Ordinarily, these factors weigh in favor of "some kind of hearing" before the government discharges its employees if they can be terminated only for cause. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 n.7 (1972); *see also Loudermill*, 470 U.S. at 452.

Although a pre-termination hearing is ordinarily necessary, it "need not be elaborate." *Loudermill*, 470 U.S. at 545. A "very limited" hearing can suffice, with "a more comprehensive post-termination hearing" to follow. *Gilbert*, 520 U.S. at 929. "[T]he pretermination hearing need not definitively resolve the propriety of the discharge." *Loudermill*, 470 U.S. at 545. "It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46. "The tenured public employee is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." *Id.* at 546 (citations omitted).

Here, defendants have not shown that plaintiff Stahl received an explanation of the evidence against her or a chance to respond to that evidence before she was terminated. Plaintiff claims the only document she received was the three-page termination letter, which included only a few sentences summarizing the outside attorney's investigation, and which treated her termination as a foregone conclusion. Stahl Decl. ¶ 14; *see also* Termination Letter at 1 ("Amador Superior Court is terminating your employment due to misconduct."). Stahl did not know about the charges levied against her before she received this letter, *id.*, and defendants have not presented any evidence suggesting that Stahl had a meaningful chance to respond to the outside attorney's conclusions before she was terminated. Indeed, according to defendant Harmon's account, Stahl was terminated immediately after she reviewed the letter. Harmon Decl. ¶ 5.

Defendants argue that Stahl could have pursued a hearing after her termination instead. "There are, of course, some situations in which a postdeprivation hearing will satisfy due process requirements." *Loudermill*, 470 U.S. at 542 n.7. This may be so if the government "must act quickly," or if "it would be impractical to provide predeprivation process." *Gilbert*, 250 U.S. at 930. In *Gilbert*, for example, the Supreme Court held that the government could immediately suspend a tenured police officer without pay after the officer was charged with a felony. *Id.* at 931–35. But here, defendants have not cited any evidence that could justify their haste. Moreover, the record on summary judgment suggests no urgency. If anything, the evidence before the court on summary judgment suggests the defendants moved faster than necessary. According to the court's personnel manual, if the superior court is "considering disciplinary action against an employee more severe than a suspension without pay for five working days or less," it has agreed to give the employee "written notice of the proposed disciplinary action." Personnel Manual § 11.1.5. That notice must include "a description of the proposed discipline, the date it is intended to become effective, a description of the facts and circumstances upon which the proposed discipline is based, and a statement informing the employee of his or her right to respond either orally or in writing to the charge by a specified date." *Id.* In addition, "[i]f the proposed discipline is based, in whole or in part, on written materials or documents, the notice shall either provide the employee with copies of the materials or documents or, in the alternative, inform the employee of when and where they may be reviewed." *Id.* The defendants have not explained why this procedure was deemed appropriate for disciplining employees in general, but not to be appropriate in Stahl's case.

Defendants also argue Stahl cannot prove that her termination fell short of constitutional standards because she did not pursue the procedural remedies available to her. *See* Mem. at 4–6, 12–13. Defendants cite the California Trial Court Act, for example, which allows former court employees to challenge their terminations. *See id.* at 12–13 (citing Cal. Gov't Code §§ 71653, 71655 71658, 71653 and Cal. Civ. Proc. Code § 1094.5). This argument has its roots in *Parratt v. Taylor*, 451 U.S. 527 (1981), but misapplies the logic behind that decision.

/////

13

In *Parratt*, the plaintiff, an inmate at a Nebraska prison, alleged prison officials had negligently lost a package of materials he had ordered in the mail. *See id.* at 530. He brought a claim under § 1983, asserting the government had deprived him of his property without due process. *Id.* The Supreme Court held first that because § 1983 does not include "any express requirement of a particular state of mind," the plaintiff could move forward with his claim that prison officials had acted negligently. *See id.* at 535. The Court later reconsidered that decision and "overrule[d] *Parratt* to the extent that it states that mere lack of due care by a state official may 'deprive' an individual of life, liberty, or property under the Fourteenth Amendment." *Daniels*, 474 U.S. at 330–31.

The next question in *Parratt* was whether prison officials had deprived the plaintiff of his property "without due process of law." *See* 451 U.S. at 537. The Supreme Court had not previously decided "what process is due a person when an employee of a State negligently takes his property." *Id.* It began by noting that ordinarily, as explained above, "due process requires a predeprivation hearing before the State interferes with any liberty or property interest enjoyed by its citizens." *Id.* Most of the time, however, when a predeprivation process was found to be necessary, the defendants had been following some "established state procedure." *Id.* at 538. The plaintiff in *Parratt*, by contrast, alleged that the defendants had *not* done what was expected of them—they had fallen short of the relevant standard of care. It was difficult to imagine how the state could have offered any process in advance of its employee's "random and unauthorized act." *Id.* at 541. In that situation and with that context, the Court reasoned, a state could satisfy its constitutional obligations by offering a procedure after the fact, for example by entertaining a common law tort claim. *See id.* at 541, 543–44. Nebraska had offered such a remedy, and the plaintiff had not pursued it, so he could not show that the state had deprived him of his property without due process. *See id.* at 543–44.

In *Hudson v. Palmer*, 468 U.S. 517 (1984), the Supreme Court extended this rule to intentional misconduct. "The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct." *Id.* at 533. For that reason, "an unauthorized intentional deprivation of property by a

14

state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Id.* In sum, between *Parratt* and *Hudson*, "meaningful postdeprivation remedies will suffice when the deprivation was the 'result of a random and unauthorized act by a state employee.'" *Miranda v. City of Casa Grande*, 15 F.4th 1219, 1226 (9th Cir. 2021) (quoting *Parratt*, 451 U.S. at 541).

Stahl's case simply does not fit that description. Defendants do not claim and have not shown their actions were "random" or "unauthorized." As explained above, no evidence suggests it would have been impossible or even difficult to offer Stahl a hearing before her termination, as the Supreme Court has said is ordinarily necessary. *See Loudermill*, 470 U.S. at 545. The cases that defendants rely on do not establish otherwise. Each concerned allegations of bias, unfairness, or a lack of qualifications by some purportedly neutral decision maker. *See Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir. 1987); *Garrett v. Governing Bd. of Oakland Unified Sch. Dist.*, 583 F. Supp. 3d 1267, 1278 (N.D. Cal. Feb. 4, 2022); *Killgore v. City of S. El Monte*, No. 19-0442, 2019 WL 8105371, at *12 (C.D. Cal. Dec. 19, 2019). An adjudicator's wrongful failure to disclose a bias and to recuse—or to conceal a bias intentionally—is the type of "random" and "unauthorized" action the Supreme Court envisioned in *Parratt* and *Hudson*. This case includes no similar allegations of wrongdoing and nothing that might make a predeprivation hearing impossible or impracticable.

Finally, defendant Harmon contends she would not be liable even if Stahl was deprived of a constitutional right without due process. First, Harmon argues that she was not personally involved in the decision to terminate Stahl's employment. Mem. at 7–9. Section 1983 imposes liability on any person who "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To prevail on a claim brought against an individual state officer under § 1983, a plaintiff must show the officer "caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

/////

One straightforward way to make this link is to show that an officer was personally involved in some action that deprived the plaintiff of constitutional rights; courts have often expressed the causation rule in these terms. *See, e.g.*, *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."). Although "personal participation" is a convenient shorthand, it "is not the only predicate for section 1983 liability." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). As the Ninth Circuit has explained, an officer can "subject" another to the deprivation of a constitutional right under § 1983 by doing some "affirmative act," by participating in another person's affirmative acts, or by not performing some act "he is legally required to do" if that conduct "causes the deprivation of which complaint is made." *Id.* (quoting *Johnson*, 588 F.2d at 743). "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* (quoting *Johnson*, 588 F.2d at 743–44).

Defendant Harmon has not established on summary judgment that she did not "cause" Stahl's termination in this regard. Defendant Harmon was the only member of the human resources department when Stahl was terminated. Harmon Decl. ¶¶ 2–6; Ex. 24 at 2–3; Harmon Dep. at 8–9. She coordinated interviews between the outside attorney who investigated Stahl and the court's personnel, prepared paperwork related to Stahl's termination, including the termination letter itself, and attended the afternoon meeting at which Stahl was terminated. Harmon Decl. ¶¶ 2–6; Mallory Dep. at 95–96, ECF No. 43-12. Stahl believed that Harmon was leading that meeting. Stahl Decl. ¶ 14. The court's executive officer believes Harmon concurred in the decision to terminate Stahl, Klotz Dep. at 69, and Stahl's union representative understood similarly from the context, Mallory Dep. at 95–96. A reasonable jury could also find from the evidence before the court that Harmon personally involved herself by implicitly denying Stahl's request for a hearing during the termination meeting. Stahl Decl. ¶ 14. A reasonable fact-finder

/////

16

could infer from this evidence that Harmon played a personal role in the decision to end Stahl's employment without adequate notice and a chance to be heard.

Of course, a jury might also find otherwise. Defendant Harmon anticipates testifying at trial that she did not decide to terminate Stahl, did not tell the court's executive officer to terminate Stahl, and had no authority to make that decision in the first place. Harmon Decl. ¶ 3, 6. She anticipates describing her role as "administrative" and ministerial and limiting her role in the afternoon meeting to serving as a "witness" and nothing more. *Id.* ¶¶ 5–6. The memorandum of understanding between the superior court and Stahl's union did not require Harmon to sign off on a dismissal; it required only the "authorization of the Court Executive Officer." Mem. of Understanding § 18.1.3(e). But this evidence does not establish beyond dispute whether Harmon performed an "affirmative act," participated "in another's affirmative acts," "omit[ed] to perform an act" she was required to do, or "set[] in motion a series of acts" she knew or should have known would end in Stahl's termination. *Lacey*, 693 F.3d at 915 (quoting *Johnson*, 588 F.2d at 743–44).

Next, defendant Harmon argues that she cannot be liable because her actions were no worse than negligence. Mem. at 8–9. She again portrays her actions as "marginal" and ministerial, such as filling out paperwork, scheduling interviews, and observing meetings. *Id.* at 9. It is true that "negligently inflicted harm is categorically beneath the threshold of constitutional due process," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998), but Stahl's theory of the case is not that Harmon terminated Stahl unintentionally and negligently by filling out paperwork and scheduling meetings. Nor is it that Harmon had a duty to act but did nothing. As explained above, Stahl claims Harmon intentionally participated in the events that culminated in her termination, and Harmon has not shown on summary judgment that these claims would go unproven at trial.

Accordingly, defendants' motion for summary judgment as to Stahl's procedural due process claim will be denied.

/////

/////

**CONCLUSION**

For the reasons set forth above,

1. Defendants' motion for summary judgment, or in the alternative, partial summary judgment (Doc. No. 43) is granted in part and denied in part as follows:

   a. Defendants' motion for summary judgment as to plaintiff's substantive due process claim is granted;

   b. Defendants' motion for summary judgment as to plaintiff's procedural due process claim is denied;

2. The court now sets this case for a Final Pretrial Conference on **February 7, 2023 at 1:30 p.m.** before District Judge Dale A. Drozd by Zoom;

   a. The parties shall refer to Judge Drozd's Standing Order (Doc. No. 49) for Zoom appearance information;

   b. As provided in the Standing Order, the parties shall meet and confer and file a joint pretrial statement **at least seven (7) days** before the date set for the final pretrial conference; and

3. The court also sets this case for a jury trial on **April 3, 2023 at 9:00 a.m.** before District Judge Dale A. Drozd in Courtroom 4.

IT IS SO ORDERED.

Dated:  **November 1, 2022**

UNITED STATES DISTRICT JUDGE